IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *    Criminal No. 20-00089-JB |
| | * |
| MARK W. COOPER | * |

### GOVERNMENT'S RESPONSE IN OPPOSITION
### TO DEFENDANT'S MOTION TO SUPPRESS (Doc. 115)

Comes now the United States, by and through the United States Attorney for the Southern District of Alabama, and files its response to the defendant's abovecaptioned motion (Doc. 115) as follows:

**Facts**

The Government expects that the evidence will show that on or about September 12, 2018, Baldwin County Drug Task Force agents were looking for Co-defendant Von Clay Bennett Jr.'s mother at 15464 Pine Grove Road Extension, Bay Minette, to find out whether she had information on the whereabouts of her son. She was also wanted on active arrest warrants from the sheriff's office. When they arrived at the mother's address, which was also the address for Mark Wayne Cooper according to the tag registration on the Dodge truck observed in surveillance on July 30,[1] they found that Cooper was at the premises, in a garage converted into

---

[1] On July 30, 2018, investigators were conducting surveillance at an apartment on Azalea Road in Mobile, where they suspected Bennett was staying. The observed as Bennett left the apartment at 6:10 p.m. driving the white Lexus, displaying Alabama tag 9567AW2. Investigators followed the Lexus to a gas station on Navco Road and McVay Drive. He bought gas there then traveled to a restaurant on the Causeway, R & R Seafood. There, he pulled into the parking lot beside a Dodge Ram truck, displaying Alabama tag 8052AZ4. The vehicle was registered to Mark Wayne Cooper, whose address was listed at 15464 Pine Grove Road Extension, in Bay Minette. Investigator Middleton observed the driver of the Dodge truck and was able to identify him as the defendant, Mark Wayne Cooper. The investigators observed as Bennett left the Lexus and entered the passenger side of the Dodge truck. The meeting in the truck lasted only a few minutes and Bennett returned to the Lexus. Both vehicles departed the

1

an apartment. Cooper said he lived at the address in the apartment. Cooper told the investigators that he knew Bennett. He invited them inside to discuss the matter.

While investigators were talking to Cooper, they noticed that he was extremely nervous, unable to remain still, and moving around, sitting then standing. Agents knew that Cooper was an associate of Bennett's, and during surveillance of Bennett on July 30 as detailed in footnote 1, they had previously observed Bennett meet with Cooper at a restaurant in Spanish Fort, for what was suspected to be a drug transaction. Investigator Harville observed two cut corner baggies on the floor of the apartment, and one was tied at the top in a manner used to package drugs. Cooper admitted that he used meth ice and that he had used it recently.

At that point, Investigator Harville asked him if he had any weapons on his person. He said no, but he had some channel lock plyers in his back pocket, which he removed. Investigator Harville asked him to turn his pockets inside out so they could see that he had no other weapons. He agreed to do that, and while emptying his pockets, he removed a clear plastic baggie which contained what appeared to be meth ice. Although he attempted to put the drugs back into his pocket, agents had seen it and he was detained. Cooper was advised of his rights and he said he understood his rights. He also agreed to waive his rights and he consented to a search of the apartment in writing.

Officers located approximately $2,279 in cash, a glass pipe, a scale and a package of plastic baggies used to package meth were also found. Cooper told the investigators that at least half the cash was from drug sales. He claimed that he was self-employed doing carpentry work. He admitted that he had been buying meth ice from Bennett for 3 months, and that he had obtained two ounces each week. He said he would meet Bennett in public places for the deal,

---

parking lot. Bennett drove back to Mobile County. Cooper drove toward Spanish Fort and surveillance officers discontinued the surveillance.

including the restaurant where agents observed the meeting between him and Bennett. Cooper admitted that he had about five "good customers" who were buying meth ice from him, which he had received from Bennett. He said one of them bought about an 8-ball every day; and the others bought an 8-ball every two or three days. He claimed he only had a few people who were buying grams from him. After Bennett's arrest in Mobile, Cooper began to get his meth ice from from Pensacola. The drugs seized from Cooper tested at the DEA lab as 12 grams of methamphetamine at 80% purity, or 10.2 grams of actual methamphetamine.

### Argument

The defendant's motion seeks to suppress "the alleged contraband and subsequent statements" which occurred from the incident detailed above. As an initial matter, the Government submits that the motion fails to identify with specificity which evidence is sought to be suppressed and on what specific grounds. A motion failing to state these grounds is insufficient on its face to support a need for a hearing, and it is due to be denied without a hearing. See *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) (a motion to suppress must be sufficiently specific, not making mere conclusory allegations, citing *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir.1985)).

If the Court finds that the motion is facially sufficient, the Government submits it is due to be denied. In *United States v. Figueroa*, 419 Fed. Appx. 973 (11th Cir. 2011), the magistrate judge conducting a suppression hearing encountered a similar motion to suppress based upon the same claim as in the instant case, that the defendant was intoxicated by drug use prior to the execution of the consent to search and his consent was involuntary. The evidence produced at the hearing established that the federal agents arrested Figueroa at his apartment and asked for his consent to search it. The agent testified that Figueroa seemed coherent and capable of knowingly granting consent because he responded clearly to the agent's questions. The agent testified that Figueroa appeared slightly dazed, but he attributed that to the fact that a SWAT

3

team had just broken down his door at 6:00 a.m., to arrest him. The agent produced and read a consent to search form to Figueroa, which Figueroa subsequently signed.

Although the agent did not ask Figueroa whether he was under the influence of drugs, alcohol, or medication, the agent testified that he had professional experience interacting with intoxicated people and that Figueroa did not appear intoxicated at the search scene. A couple of hours later, the agent explained that Figueroa began to exhibit signs of intoxication. Even so, Figueroa was able to provide the agent with his identifying information, and the agent believed that he was still coherent, responsive and able to understand the situation. Another agent testified that he had observed Figueroa inside the apartment and had interacted with Figueroa outside in the patrol car. In the apartment, the second agent testified that Figueroa looked a little groggy or lethargic, but a short time later, Figueroa seemed coherent and able to understand what the second agent was saying to him. *Id*. at 976-77.

Figueroa testified at the hearing that he had been using heroin for about 10 years, and during the month before his arrest, he had been using heroin every day. Figueroa testified that when he used heroin, he was unable to interact with other people or understand what they said to him. Figueroa did not know how long these effects lasted, and said that heroin usually made him fall asleep. He also testified that he took Xanax and heroin on the evening prior to his arrest, but he could not recall when he used the heroin or when he went to sleep. He testified he could not recall the events of his arrest because he was still high on heroin. *Id*. at 977.

The magistrate judge credited the testimony of the agents and found Figueroa's testimony unreliable and incredible. The report and recommendation was to deny the motion to suppress, and the district court adopted it, finding no reason to disturb the magistrate judge's credibility determinations. *Id*.

The legal standard applied to the findings of fact in *Figueroa* (and which would apply to the instant facts) requires a review for clear error and the court's application of the law to those

4

facts is reviewed de novo. *Id.* at n.3, citing *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). The voluntariness of a consent to search is a factual determination which will not be reversed on appeal unless it is clearly erroneous. *Id.*, citing *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002).

Consent to search is voluntary if it is produce of an "essentially free and unconstrained choice." *Id.* at 977-78, citing *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001). In evaluating voluntariness, the court will examine several factors, including "the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found. *Id.*, citing *Purcell*, 236 F.3d at 1281.

A claim of intoxication does not necessarily vitiate consent. *Id.*, citing *United States v. Bertram*, 805 F.2d 1524, 1526-28 (11th Cir. 1986) (upholding finding that defendant's wife freely gave consent to enter the home where she had been drinking but officer testified she was coherent); *Hubbard v. Haley*, 317 F.3d 1245-54 (11th Cir. 2003) (concluding defendant's statement was freely given even though he had consumed alcohol); *United States v. Postal*, 589 F.2d 862, 890 n.45 (5th Cir. 1979) (noting that defendants' claimed intoxication was only one factor to consider in determining the voluntariness of their consent to search).

While the *Figueroa* case is an unpublished decision, the analysis underlying the decision is persuasive when applied in the instant case. The Government submits that the evidence will show that Cooper was not rendered unable to give knowing and voluntary consent to search, and that the evidence discovered upon the search of the apartment is admissible.

As for Cooper's post-Miranda statement, the Government must meet a two-part test to establish the admissibility of such a statement: First, the court must determine whether the Miranda waiver is valid, and second, the court must determine whether the statement was

5

voluntary. *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010). To show that a defendant has validly waiver his Miranda rights, the totality of the circumstances must show (1) an uncoerced choice and (2) an awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id*., citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The court considers the totality of the circumstances, including the details of the interrogation and the defendant's characteristics. *Bernal-Benitez*, 594 F.3d at 1319. These include the defendant's lack of education or low intelligence, the lack of any advice of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the used of physical punishment such as the deprivation of food or sleep. A claim of intoxication would affect the second prong of the Miranda rights—whether he was too affected by alcohol or drugs to knowingly, intelligently and voluntarily waive his rights that he was not coherent and did not understand what was happening.

In *United States v. Martin*, 434 F.2d 275, 278-79 (5th Cir. 1970), the court concluded that the defendant's intoxicated state was relevant to whether he knowingly and voluntarily waived his Miranda rights. The *Martin* Court found that the defendant had been drinking and was affected by alcohol to some degree, but "his faculties were not so impaired that he did not understand what was going on nor was he incoherent." [2] The motion to suppress was denied, and that ruling was upheld on appeal.

In the instant case, Cooper's admission that he used methamphetamine before speaking with the officers is not sufficient, in and of itself, to vitiate the voluntariness of the waiver of rights. The Government submits that the evidence will show that he was not impaired to the extent that he did not understand the rights waiver or that he was incoherent in speaking with the

---

[2] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

officers. Upon such a showing, the motion should be denied.

WHEREFORE, the Government files its response in opposition to the motion to suppress and submits that the motion is due to be denied.

          Respectfully submitted,

          RICHARD W. MOORE
          UNITED STATES ATTORNEY

          By: s/Gloria A. Bedwell
          Gloria A. Bedwell bedwg1000
          Assistant United States Attorney
          63 South Royal Street, Suite 600
          Mobile, Alabama 36602
          (251)441-5131 (fax)
          (251)441-5845
          gloria.bedwell@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that I have filed a copy of the above pleading with the Clerk of Court using CM/ECF, which automatically serves a copy of the same upon the attorney of record for the defendant, this 31th day of December, 2020.

          s/ Gloria A. Bedwell
          Gloria A. Bedwell
          Assistant United States Attorney